# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

PHAROAH V. MORRIS,

        Plaintiff,

                                  Case No. 05-C-0458

LETITIA LEY, *et al.*,

        Defendants.

---

## ORDER

---

Plaintiff Pharoah V. Morris, a state prisoner at all times relevant, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. He is proceeding *in forma pauperis* on claims under the Eighth and Fourteenth Amendments. Currently pending is the defendants' motion for summary judgment. For the reasons set forth herein, defendants' motion will be granted in part and denied in part.

## I. BACKGROUND

On April 21, 2005, plaintiff lodged a civil rights complaint against twenty-six correctional officers, supervisors and staff members of Waupun Correctional Institution (WCI) and Columbia Correctional Institution (CCI). Although the court discerned three possible claims in plaintiff's 145-page rambling complaint, it was dismissed on June 10, 2005, for failing to set forth a short and plain statement showing the plaintiff was entitled to relief as required by Fed. R. Civ. P. 8(a). Plaintiff was advised, however, that he could re-file an amended complaint within thirty days.

On June 29, 2005, the plaintiff filed an amended complaint setting forth the three claims the court had previously identified against eleven of the originally named defendants. Despite the court's efforts to encourage plaintiff to file a more concise complaint naming as defendants only the individuals potentially liable for the claims asserted, the number of defendants grew back to twenty-three when the court permitted plaintiff to proceed on a third amended complaint that added another claim.

In any event, the claims on which plaintiff has been allowed to proceed and the defendants named in those claims are as follows: 1) an Eighth Amendment claim that defendants Ley, Ankarlo, Core and Knapp failed to protect plaintiff from attack by another inmate; 2) a Fourteenth Amendment claim that defendant Fuerstenberg, the advocate assigned to plaintiff for his disciplinary hearing, failed to present important evidence at his hearing; that defendants O'Donovan and Schultz, who served on the adjustment committee, denied him due process and equal protection; and that defendant McCaughtry refused to reverse the disciplinary sentence imposed despite its unfairness; 3) an Eighth Amendment claim that defendants Ericksons, Douma, Higbee, Nickel and Nelson refused to transfer plaintiff from an unsanitary cell smeared with human feces; and 4) an Eighth Amendment claim against defendants Wallintin, McCaughtry, Schmitt and Aguirre that he was denied winter clothing.

On December 1, 2005, the defendants filed a motion to dismiss. By order of January 25, 2006, the court denied the defendants' motion and issued a scheduling order setting forth the deadlines for discovery and dispositive motions. The defendants then filed a renewed motion to dismiss, and the plaintiff filed three motions to compel, a motion to award fees, a motion for sanctions and a motion to stay. All these motions were denied by order of September 7, 2006.

2

Currently pending is the defendants' May 30, 2006, motion for summary judgment. The plaintiff filed a response on August 21, 2006, and the defendants filed their reply on September 29, 2006. Thus, the defendants' motion for summary judgment is fully briefed and ready for disposition.

## A.     Standard of Review

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), courts should act with caution in granting summary judgment. *Anderson*, 477 U.S. at 255. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *Id.* at 248.

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden simply by pointing out the absence of evidence. *Id.*

3

at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id*. at 323-24. Neither party may rest on mere allegations or denials in the pleadings, *Anderson*, 477 U.S. at 248, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

**B.      Preliminary Matters**

The claims on which plaintiff was given leave to proceed were those described in the court's previous screening orders. (*See* Orders of July 8 and September 2, 2005.) But plaintiff's third amended complaint, the operative complaint in the matter, also includes a claim that various other defendants violated his due process rights in transferring him from WCI to CCI for a ten-day period in October of 2003. The third amended complaint also names additional defendants in connection with his claim that he was deprived of due process in the course of the September 25, 2003, disciplinary proceeding. Although the claim arising out of the disciplinary hearing is properly before me, the due process "transfer claim" is not. The plaintiff is precluded from raising such a claim for several reasons. First, as discussed, the court did not identify the plaintiff's allegations as stating a claim in either screening order. Second, even if the plaintiff were permitted to pursue such a claim, he has no due process right to be housed in any particular facility. *Whitford v.*

4

*Boglino*, 63 F.3d 527, 532 (7th Cir. 1995); *see also Caldwell v. Miller*, 790 F.2d 589, 603 (7th Cir. 1986)("A prisoner cannot invoke due process safeguards to challenge his initial assignment to a corrections facility, or to question his transfer from one institution to another, whether intrastate or interstate.").[1] Thus, to the extent the plaintiff has presented arguments that he was denied due process when he was transferred from WCI to CCI, his averments will be disregarded.

Next, the plaintiff submits that defendant Knapp's affidavit should be disregarded because it has not been signed. (Pl.'s Aff. ¶ 18.) Federal Rule of Civil Procedure 11 provides in pertinent part:

> **(a) Signature.** Every pleading, written motion, and other paper shall be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented an attorney, shall be signed by the party. . . . An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.

In the May 30, 2006, Certificate of Service for the defendants' motion for summary judgment, AAG Amanda A. Tollefsen, counsel for the defendants, stated that defendant Knapp was on vacation when the motion was filed and that a signed affidavit would be forthcoming. (Docket

---

[1]It appears from plaintiff's exhibits that his transfer to CCI was in violation of Fed. R. App. P. 23(a), which prohibits the custodian of a prisoner seeking habeas corpus in federal court from transferring the prisoner to another institution without authorization. *See* Pl.'s Exhibits 35, 36, and 37. Apparently, there was a pending appeal from the denial of a petition for habeas corpus filed by plaintiff at the time of his transfer on October 13, 2003. In response to plaintiff's motion to enjoin the transfer filed in the Court of Appeals for the Seventh Circuit, counsel for the warden explained that the violation was inadvertent and that the transfer was ordered for security reasons to separate plaintiff from another inmate with whom he had twice been in fights. Plaintiff was immediately transferred back to WCI on October 23, 2003. (Pl.'s Ex. 37, ¶¶ 3-6, 11.) Since this is the only relief plaintiff was entitled to for a violation of Rule 23(a), I decline to consider the claim further. *See Ward v. United States Parole Commission*, 804 F.2d 64, 66 (7th Cir. 1986) (noting that Rule 23(a) intended to insure that jurisdiction over case is not lost or case mooted as a result of transfer.)

No. 118.)  However, no signed affidavit or signature page was subsequently filed by, or on behalf of, defendant Knapp.   Thus, defendant Knapp's affidavit will be disregarded.

Finally, the defendants assert that defendant Ericksons should be dismissed because the plaintiff has failed to serve him.  (Def.'s Br. in Supp. of Mot. for Summ. J. at 2 n.2.)  An inmate proceeding *in forma pauperis* (as the plaintiff is) may rely on the Marshals Service to serve process. *Sellers v. United States*, 902 F.2d 598, 602 (7th Cir. 1990).  The inmate need furnish "no more than the information necessary to identify the defendant."  *Id*.  The marshal's failure to complete service, once furnished with the necessary information, is automatically "good cause" requiring an extension of time under Rule 4(m).  *Id*.; *Graham v. Satkoski*, 51 F.3d 710, 713 (7th Cir. 1995).

In the present case, the plaintiff provided the defendant's last name, his place of business and his employment position. (*See* Third Compl. at 7.)  A waiver of service of summons was returned unexecuted on November 16, 2005, and December 16, 2005.  (*See* Docket Nos. 47 & 64.) The only indication as to why the waivers were returned unexecuted is that there was "not enough info for search."  (Docket No. 64.)

At this stage of the proceedings, it is unclear whether the Marshals Service has made sufficient efforts to serve defendant Ericksons.  *See Graham*, 51 F.3d at 713 (explaining that once provided with information necessary to identify the defendant, "the Marshals Service should be able to ascertain the individual's current address, and on the basis of that information, complete service").  Thus, the court finds that dismissal of defendant Ericksons is premature.  Accordingly, the Marshals Service will be directed to exercise reasonable efforts to ascertain the address of defendant Ericksons and serve him.  If service is not completed, the Marshal shall submit an

affidavit explaining what efforts were made to obtain the address of defendant Ericksons. Such affidavit shall be filed on or before January 20, 2007.

Having disposed of the preliminary matters, I now turn to consideration of the motion before me.

## III. ANALYSIS

### A.    Failure to Protect

The plaintiff asserts that defendants Letitia Ley, Gary Ankarlo, Thomas Core and Douglas Knapp knew that the plaintiff was threatened with serious harm and did nothing to prevent it. (Third Compl. at 25.) Defendant Ley is a Psychological Associate; her duties include providing mental health services to offenders. Defendant Ankarlo is her supervisor, and defendants Core and Knapp are part of the security staff at WCI.

The record reflects that on July 23, 2003, the plaintiff sent an Interview Request to defendant Ley expressing his concerns about being moved to the Northwest Cell Hall because he feared being attacked by another inmate. (Ley Aff. ¶ 6.) Specifically, the plaintiff stated,

> I'm seeking help. . .this is not a threat . . . I'm afraid. I'm writing to inform you that since I have arrived in North Program an inmate informed me that an inmate whom I had been in a fight with while in Portage. . .named "Cooney" is now living in the North West Cell House . . . .This inmate had attacked me without cause . . . at least I was never aware of the reason. . . .I would like to avoid returning to the hole. I am afraid to communicate with the staff. That is how I got in the hole at present. I'm due to be released from North Program 7/22/03. Please Help Me.

(Pl.'s Ex. 20(A).)

In response to his letter, Ley met with the plaintiff in her office on July 28, 2003. (Ley Aff. ¶ 7.) Because plaintiff did not know the name of the inmate he feared, Ley was unable to pass the

7

information on to security so that they could be separated. Ley tried to provide the plaintiff with some possible ways of dealing with the other inmate. (Ley Aff. ¶ 8.) The plaintiff resisted Ley's suggestions. *Id.* Further, the plaintiff stated that he could not discover the inmate's real name and "he refused to deal with killers and murderers by making nice." *Id.* He claims that she should have obtained the other inmate's name from the conduct report that was issued as a result of the incident at CCI, and contends that, in fact, he later obtained a copy of the report and provided it to her. (Pl.'s Aff. ¶ 11.)

Plaintiff also claims he communicated his concerns that he would be attacked to defendants Core and Knapp. However, despite his concerns, the plaintiff was transferred into the Northwest Cell Hall on July 29, 2003. (First Am. Compl. at 11.) Subsequently, on September 5, 2003, the plaintiff and inmate Larry Wilson, who Morris now claims was the inmate who had previously attacked him at CCI, were involved in an altercation in the WCI shower area. (Ley Aff. ¶ 6.) As a result, the plaintiff suffered a swollen and busted lip, a swollen eye and headaches. (Morris Aff. ¶ 20.) Security staff observed the September 5, 2003, incident, but no one saw who started the fight. (Ley Aff. ¶ 6.)

The Eighth Amendment's Cruel and Unusual Punishment Clause imposes upon prison officials the duty to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). This duty requires prison officials "to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (internal quotations omitted). To state a failure-to-protect claim, a plaintiff-inmate must allege that (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) defendant-officials acted with "deliberate indifference" to that risk. *Id.* at 834.

To satisfy the first prong of a failure-to-protect claim, considered the objective prong, a plaintiff must allege "not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that that serious harm might actually occur." *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). A beating suffered at the hands of a fellow inmate can constitute serious harm. *Id*. And while the substantial risk standard is very high, it is not insurmountable. *Id*. at 911. It can be met by showing that a guard had knowledge that a particular inmate posed a heightened risk of assault to the plaintiff. *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000).

To meet the second prong of a failure-to-protect claim, the subjective prong, a plaintiff must establish his custodian's deliberate indifference to that substantial risk of serious harm. *Id*. at 913. "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (quoting *Farmer*, 511 U.S. at 838). Typically, such a claim asserts that a defendant-custodian failed to take protective action after a plaintiff-prisoner complained of a feared threat posed by rival gang members or a specific person. *Brown*, 398 F.3d at 914. However, deliberate indifference in failure-to-protect claims can also be "predicated upon knowledge of a victim's particular vulnerability (though the identity of the ultimate assailant is not known in advance of attack), or, in the alternative, an assailant's predatory nature (though the identity of the ultimate victim is not known in advance of the attack)." *Id*. at 915.

Here, plaintiff claims that he told prison staff that he feared another inmate in Northwest Cell Hall who had previously attacked him for no reason. But prison guards are not required to

9

transfer a prisoner merely because the prisoner claims he is afraid of another inmate. If that were the case, prisoners would be able to determine their cell assignments simply by expressing fear of another inmate. It is true that plaintiff had previously been in a fight with Wilson. However, the conduct report plaintiff claims defendants should have consulted does not support plaintiff's claim that he was the victim of an unprovoked attack by Wilson. According to the report, plaintiff and Wilson were seen exchanging closed-fist blows with each other at CCI on January 15, 2001, more than two-and-a-half years earlier. Neither inmate stopped fighting when ordered to do so, and plaintiff had to be restrained. (Pl.'s Ex. 1.) Both inmates were removed from the unit, and ultimately, plaintiff was disciplined for his role in the fight. Thus, even if the WCI defendants had found the previous CCI conduct report, it fails to support plaintiff's claim that Wilson posed a substantial threat to his physical safety.

The record is also bereft of any evidence that plaintiff was particularly vulnerable, or that Wilson has a predatory nature. In fact, if anything, the evidence suggests that plaintiff was more than able to protect himself against Wilson. Plaintiff avers in his affidavit that he "was able to fight my attacker off" when Wilson allegedly attacked him in the shower. (Pl.'s Aff. In Opp. at ¶ 40.) The only injuries plaintiff sustained as a result of the fight, a swollen lip and eye, fall far short of the serious harm that inmates must be at substantial risk of sustaining before prison authorities can be found liable. *See Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006) (holding that split lip and a swollen cheek do not rise to the level of an objectively serious medical need). Other than the one previous fight between them, there is no evidence that Wilson posed any threat to plaintiff. Plaintiff offers no explanation, other than his own say-so, as to why prison officials should have realized that Wilson posed a substantial risk of causing him serious injury. For the reasons noted above,

however, his say-so is not enough. I therefore conclude that plaintiff has failed to show the existence of evidence sufficient to establish that any of the defendants knew he was at substantial risk of serious injury. For that reason alone, plaintiff's failure-to-protect claim fails.

As to defendants Ley and Ankarlo, plaintiff's failure-to-protect claim also fails because plaintiff is unable to establish any deliberate indifference on their part. The record clearly shows that Ley responded to the plaintiff's July 23, 2003, letter by setting up a meeting with the plaintiff during which she tried to collect additional information about the as-yet-unknown inmate's identity. Further, Ley advised the plaintiff on ways to confront and diffuse a possible conflict with inmate Wilson. She also attempted to locate the CCI conduct report to learn the identity of the inmate whom plaintiff claimed to fear and passed the information plaintiff had given her on to the security staff. (Ley Aff. ¶¶ 7-10, 14.) Thus, while Ley might not have taken all the action the plaintiff requested, it is clear that she did not disregard his complaints.

At most, defendant Ley's actions constitute negligence. However, deliberate indifference requires more than an allegation that prison officials were negligent or even grossly negligent. *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005). Rather, deliberate indifference requires an allegation that prison officials were criminally reckless. *Id*. "Failure to protect an inmate from harm violates the Eighth Amendment's prohibition of cruel and unusual punishment only if deliberate indifference by prison officials [to the prisoner's welfare] effectively condones the attack by allowing it to happen[.]" *Borello v. Allison*, 446 F.3d 742, 749 (7th Cir. 2006). Finally, there is absolutely no evidence that defendant Ley, or any other prison official for that matter, arranged for inmate Wilson to attack the plaintiff. *Cf. Case v. Ahitow*, 301 F.3d 605, 606-07 (7th Cir. 2002)(discussing evidence of guard offering to cover for prisoner who planned to attack another

11

prisoner). Based on this, no reasonable fact-finder could conclude that defendant Ley acted with deliberate indifference to the plaintiff's safety.

The same is true of defendant Ankarlo. It is undisputed that Ankarlo did not speak with the plaintiff about his concerns of being attacked by another inmate, nor did he receive any correspondence from the plaintiff asking to be transferred to a different cell hall. Defendant Ley consulted with Ankarlo as to the steps she was taking to advocate for the plaintiff concerning his request to be separated from inmate Wilson. Ley informed Ankarlo that she had passed on to security staff any information she received from the plaintiff regarding inmate Wilson so that security could determine whether the inmates should be separated.

Plaintiff believes that Ankarlo's involvement as Ley's supervisor makes him liable for the alleged constitutional violation. However, there is no *respondeat superior* liability under § 1983. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996). Supervisory officials may be personally responsible for the constitutional torts of their subordinates only if the official knows of and facilitates, approves, condones, or turns a blind eye to the conduct. *See Chavez v. Cady*, 207 F.3d 901, 906 (7th Cir. 2000); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Because the evidence establishes that Ley was not deliberately indifferent, it necessarily follows that Ankarlo, who oversaw her response, was not deliberately indifferent either. Accordingly, for this reason also, defendants Ley and Ankarlo are entitled to summary judgment on plaintiff's failure-to-protect claim.[2]

---

[2]This additional ground for granting summary judgment does not apply to defendants Core and Knapp. They deny any recollection of plaintiff communicating his concern to them and so took no action.

**B.    Due Process**

Plaintiff next claims that his due process rights were violated when he was found guilty of fighting in violation of Wis. Adm. Code § DOC 303.17 and sentenced to four days of Adjustment and 180 days of Program Segregation.  (Tollefson Aff., Ex. A at 4-5, 10.)    Although defendant McCaughtry later modified his sentence to 4 days Adjustment and 180 days Disciplinary Separation,[3] plaintiff claims that defendant McCaughtry; defendants Schultz and O'Donovan, who made up the Adjustment Committee; and defendant Fuerstenberg, his assigned advocate, violated his due process rights when they failed to adhere to the requirements of the Wisconsin Administrative Code during his September 25, 2003, Disciplinary Hearing.  (Third Compl. at 31 & 37.)    Specifically, he contends that defendant Fuerstenberg violated his rights under the Wisconsin Administrative Code when she withheld relevant information from him, failed to ensure that all questions he wanted to ask his witnesses were answered, and presented confidential information concerning his health to the Adjustment Committee without his knowledge or consent. (Third Am. Comp. at 31-32.)    Defendant McCaughtry is alleged to have denied plaintiff due process in accordance with the Wisconsin Administrative Code by affirming the Adjustment Committees finding that he was guilty of fighting.  *Id.* at 33.  And defendants Schultz and O'Donovan are alleged to have violated plaintiff's due process rights, as provided by the Wisconsin Administrative Code, by not requiring defendant Ley to testify in person at the hearing and by failing to ask his witnesses all of the questions he proposed.  *Id.* at 37-38.

_____

[3]The primary effect of this modification was to restore any good time plaintiff otherwise would have lost.  The conditions of Program Segregation and Disciplinary Separation are essentially the same, except that inmates in Disciplinary Separation earn good time, whereas inmates in Program Segregation do not.  Wis. Adm. Code § DOC 303.70.

13

To establish a procedural due process violation, a prisoner must first demonstrate that the state deprived him of a liberty or property interest created either by state law or the Due Process Clause itself. *See Sandin v. Connor*, 515 U.S. 472, 483-84 (1995). The state has no constitutional obligation to provide an inmate any procedural protection unless it deprives him of a liberty interest. And the mere fact that plaintiff was transferred from the general prison population to Program Segregation does not mean he was deprived of a liberty interest. *Williams v. Ramos*, 71 F.3d 1246, 1249 (7th Cir. 1995) ("The Due Process Clause does not necessarily protect prisoners against the imposition of disciplinary segregation."). A prisoner has no liberty interest in remaining in the general prison population. *Hewitt v. Helms*, 459 U.S. 460, 467-68 (1983). Only if the conditions of his confinement impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin*, 515 U.S. at 484, will a liberty interest sufficient to trigger procedural protections of the Due Process Clause be found.

The determination of whether the conditions of confinement in disciplinary segregation pose an atypical and significant hardship is not made simply by comparing the conditions of disciplinary segregation to those in the general prison population, however. They must also be compared to those of discretionary or administrative segregation of the type used for inmates in protective custody or for administrative purposes. *Lekas v. Briley*, 405 F.3d 602, 608 (7th Cir. 2005). Indeed, the Seventh Circuit has suggested that the proper comparison, in view of the state's right to transfer a prisoner without a hearing, is with the conditions in the most restrictive prison in the state. *Id.* at 609; *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir.1997). If the conditions are not significantly different and the placement in disciplinary segregation does not affect the length of the prisoner's sentence, no liberty interest is at stake. *Lekas*, 405 F.3d at 608.

14

In *Lekas*, the Seventh Circuit held that the conditions alleged by the plaintiff in that case did not establish an atypical and significant hardship sufficient to show the existence of a constitutionally protected liberty interest. Those conditions included:

> inability to participate in prison programs, inability to participate in educational programs, inability to participate in work programs and resulting loss of prison employment and wages, loss of contact visits, loss of telephone usage, inability or substantially curtailed ability to receive visits from family, inability to attend church, no visits from clergy, drastic reduction in exercise privileges and in commissary access both in terms of frequency and the types of items allowed, drastic reduction in the number and nature of personal items that prisoners are allowed to have in their possession, and no access or very little access to audio/visual items.

*Id.* at 610. Similarly restrictive conditions were found not to give rise to a constitutionally protected liberty interest in *Thomas v. Ramos*, 130 F.3d 754, 760-62 (7th Cir. 1997) (prison inmate's 70-day confinement in disciplinary segregation was not "atypical and significant" deprivation of prisoner's liberty and thus did not implicate liberty interest protectable under Due Process Clause; prisoner has no liberty interest in remaining in the general prison population), and *Williams v. Ramos*, 71 F.3d at 1249 (holding inmate's segregation for 19 days was not atypical, significant deprivation as would support § 1983 action against prison officials for violating inmate's constitutional rights, even if inmate was locked in closed-front cell 24 hours per day, was not allowed to participate in activities available to general population or nonsegregated inmates housed in same area, was handcuffed whenever he left his cell, and lacked much contact with other inmates or staff).

Applying the foregoing here, I conclude that the conditions imposed on plaintiff in Program Segregation and/or Disciplinary Separation were not so extreme as to give rise to a constitutionally protected liberty interest.[4] *See* Wis. Adm. Code § DOC 303.70. Plaintiff alleges that he was denied

---

[4]Plaintiff's claim that he was subjected to cruel and unusual punishment during the ten days he was housed in CCI is treated separately, since such conditions were not part of the intended punishment for his infractions.

15

a work assignment while in segregation and was unable to complete an anger management program, which resulted in further restrictions on his ability to visit with his children. (Third Am. Compl. at 32.) But these are not atypical from the ordinary consequences of incarceration for crime. While it is true that the length of time he spent in segregation, 180 days, was longer than the 70 days in *Thomas*, the 19 days in *Williams*, or even the 90 days in *Lekas*, the Seventh Circuit has held that a sentence of six months in segregation is not such an extreme term as to implicate due process if the conditions are not otherwise extreme. *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir.1995). It therefore follows that no liberty interest sufficient to warrant the procedural protections of the Due Process Clause was implicated here. But even if one were, the record reflects that plaintiff was afforded the procedural protections that would have been due, or at least had an adequate post-deprivation remedy to obtain them, had he chosen to pursue it.

In *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Supreme Court set out the minimum requirements of procedural due process for prison disciplinary proceedings where a constitutionally protected liberty interest is at stake. Inmates facing the loss of such an interest, the Court held, are entitled to (1) written notice of the claimed violation at least 24 hours in advance of appearance before the adjustment committee; (2) a written statement of fact-finders as to the evidence relied on and the reason(s) for the disciplinary action taken; and (3) the opportunity to call witnesses and present documentary evidence in defense when permitting the inmate to do so would not be unduly hazardous to institutional safety or correctional goals. 418 U.S. at 563-67. The record here demonstrates that plaintiff was accorded these procedural protections.

The record before me reflects that plaintiff was issued a written conduct report charging him with battery and fighting in violation of Department of Corrections rules based on the altercation

16

that occurred with inmate Wilson in the showers. *See* Wis. Adm. Code §§ DOC 303.12 and 303.117. According to the report, Sgt. Schwantz, who was assigned to the bath house on September 5, 2003, observed plaintiff punch inmate Wilson approximately two to three times with a closed fist in front of shower #12. Schwantz notified control that there was a fight in the bath house, and then observed plaintiff and Wilson exchange several punches in front of shower #12. Another correctional officer arrived on the scene and they proceeded to secure the area and stop the fight. Plaintiff and Wilson continued to exchange blows until first responders arrived and placed them in restraints. (Tollefson Aff., Ex. A at 4-5.)

On September 8, 2003, the plaintiff received notice of a major disciplinary hearing to be held on September 25, 2003. *Id.* at 7. Defendant Fuerstenberg was appointed as plaintiff's staff advocate. Plaintiff requested that defendant Ley and inmate Clayton Garland be present at the hearing. Inmate Garland appeared and testified, but defendant Ley was not available to appear at the hearing due to "varying shifts." She did, however, provide a written statement in which she confirmed plaintiff's claim that he had previously informed her of his concern that an inmate with whom he had previously fought at CCI was now in his cell house. *Id.* at 7-9, 11-12.

On September 25, 2003, the Adjustment Committee found the plaintiff not guilty of battery and guilty of fighting, and he was sentenced to four days of adjustment segregation and 180 days of Disciplinary Segregation. The Committee also gave a written explanation for its decision, which reads:

> We find the reporting staff credible. The report writer has no vested interest in the outcome of this hearing.
>
> The committee adds the lesser included charge of fighting.

17

> The inmate does not deny that the incident occurred, just that he tried to avoid it. The inmate also gave the committee a written statement.
>
> Psychologist Ley reports that the inmate had some concerns but couldn't give an actual name and that the report the inmate referred to was not able to be found. She further states that Morris did not express any fear regarding inmate Wilson. The PSU log states that the inmate was resistant, mocking, and disparaging. The report in question was submitted by the inmate at this hearing.
>
> The report states that the inmates were observed exchanging several punches.
>
> After reviewing the report, evidence, and all of the testimony we find that the inmate along with another were trying to injure each other by physical means.

*Id.* at 10. The plaintiff appealed the finding of guilt on the fighting charge and on December 29, 2003, the warden affirmed the plaintiff's sentence, stating "no procedural errors. All matters are now correct. Evidence supports findings. Records are correct." *Id.* at 20. Finally, on February 7, 2005, defendant McCaughtry modified the plaintiff's sentence by changing the 180 days Program Segregation to 180 days Disciplinary Separation, thereby restoring all of plaintiff's good time credits that otherwise would have been lost.

Though his complaint and other filings are less than clear, plaintiff seems to be claiming that he was denied due process because 1) defendant Ley was allowed to submit a written statement, instead of appearing in person; 2) all of the questions he wanted to ask her and another witness were not asked; and 3) confidential medical information was presented to the committee without his knowledge or consent. (Third Am. Comp. at 31-32.) However, only one of these supposed defects finds support in the record and raises a serious question as to the constitutional sufficiency of the procedure. Plaintiff has offered no evidence in support his claim that confidential information was disclosed without his knowledge or consent. He does not even indicate what this information was. And the fact that every question he wanted asked was not allowed does not, by itself, even suggest

18

a due process violation. Plaintiff fails to specify what questions were not asked and, more important, what relevant evidence was thereby excluded. A prison adjustment committee, like a court, is entitled to exclude irrelevant and immaterial evidence. Plaintiff has made no showing that any relevant evidence he sought to introduce was excluded.

Plaintiff 's strongest argument in support of his due process claim is that the Committee denied him due process by allowing defendant Ley to submit a written statement instead of attending the hearing and testifying in person. As the Supreme Court emphasized in *Wolff*, "the right to present evidence is basic to a fair hearing." 418 U.S. at 566. But an inmate's right to call witnesses of his own is not unbounded:

> [T]he unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. . . . [W]e must balance the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority . . . . Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases.

*Id.*; *see also Whitlock v. Johnson*, 153 F.3d 380 (7th Cir. 1998).

Here, plaintiff obviously wanted defendant Ley to tell the Committee about his fear of Inmate Wilson and his efforts to avoid him. That plaintiff had such fear and did want to avoid the inmate he then knew only as "Coonie" seems clear from the above-quoted July 23, 2003, Interview Request he sent defendant Ley. (Pl.'s Ex. 20(A).) But the Committee heard essentially the same testimony from Inmate Garland, who did appear and testify. *Id.* at 9. The Committee found Inmate Garland's testimony "credible but not relevant." *Id.* The same conclusion would seem to follow

19

as to defendant Ley. Defendant Ley was not a witness to the fight itself, but could merely have confirmed plaintiff's claim that he had expressed fear of being attacked by another inmate who had been transferred to the same cell house. But this fact was not disputed. Ley's written statement and the accompanying reports confirm this aspect of plaintiff's defense. For this reason, the Committee was justified in excusing her from attending the hearing. Regardless of whether plaintiff feared Inmate Wilson and had previously sought to avoid him, the Committee concluded on the basis of the eyewitness account of the reporting officer that plaintiff was guilty of fighting in violation of the institution's rules. I therefore conclude that even if a constitutionally protected liberty interest was at stake, plaintiff was afforded all of the procedural protection to which he was entitled under the Constitution.

Finally, even if plaintiff was deprived of some degree of the procedural protection to which he was entitled, Wisconsin's post-deprivation proceedings are sufficient to satisfy the Constitution. Plaintiff's due process claim is really that the defendants failed to comply with the Wisconsin regulations governing such proceedings. (Third Am. Compl. at 31-34, 37.) Under Wisconsin law, the Committee is required to follow the applicable procedures. It therefore follows that an adjustment committee's failure to comply with the applicable regulations is the kind of random and unauthorized act that § 1983 does not reach unless the State fails to provide adequate post-deprivation remedies. As the Seventh Circuit has explained the point:

> Section 1983 must be preserved to remedy only those deprivations which actually occur without adequate due process of law, such as those which result from a *state's* conscious decision to ignore the protections guaranteed by the Constitution. It should not be employed to remedy deprivations which occur at the hands of a state employee who is acting in direct contravention of the state's established policies and procedures which have been designed to guarantee the very protections which the *employee* now has chosen to ignore.

*Easter House v. Felder*, 910 F.2d 1387, 1404 (7th Cir. 1990) (*en banc*).

20

When the alleged deprivation occurs not as the result of the conscious decision of the state, but instead at the hands of an employee who acts in contravention of the state's policies and procedures, no due process violation will be found unless the state fails to afford adequate post-deprivation remedy to address the deprivation. *Paratt v. Taylor*, 451 U.S. 527, 543-44 (1981), *overruled on other grounds*; *Daniels v. Williams*, 474 U.S. 327 (1986); *Hamlin v. Vandenberg*, 95 F.3d 580, 585 (7th Cir. 1996); *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). Wisconsin, however, provides post-deprivation remedies for the very kind of violations plaintiff has alleged here, and the Seventh Circuit has held that they are constitutionally sufficient:

> In this case, the inmate complaint review system and certiorari review allow consideration of alleged due process violations. Both offer relief from liberty deprivations by reinstating prisoner status in the general population (even assuming that disciplinary segregation implicates due process) and expunging the prisoner's disciplinary record. Neither can offer money damages, which would be available in a state law tort action against the prison officials, but these proceedings are neither meaningless nor nonexistent, so they provide all the process that is constitutionally required. We agree with the district court that Wisconsin post-deprivation proceedings are adequate.

*Hamlin*, 95 F.3d at 585.

The record here reveals that plaintiff failed to pursue his post-deprivation remedies. He did not seek *certiorari* in state court. (Tollefson Aff. ¶ 3.) That certainly was his choice, but he cannot now claim the loss of liberty he claims he suffered was without due process. The State offered the only procedural safeguards that were feasible—specific rules as to what procedures were to be followed before the deprivation could occur, and both administrative and judicial review of any claim that they were not. Thus, regardless of whether plaintiff's sentence to Disciplinary Separation implicated a constitutionally protected liberty interest and whether the pre-deprivation procedures were adequate, his due process claim fails. Accordingly, the defendants' motion for summary judgment on this claim will be granted.

21

## C.    Conditions of Confinement

The plaintiff claims that defendants Higbee, Douma, Ericksons, Delong, Nickel and Nelson violated his rights under the Eighth Amendment because he was placed in an unsanitary cell and kept there from October 13 to October 23, 2003.  (Third Compl. at 43.)  The Eighth Amendment requires prison officials to maintain minimal sanitary and safe prison conditions, and courts in this circuit have not hesitated to award damages when prison conditions have fallen below the threshold of decency ensured by the Eighth Amendment.  *Johnson v. Pelker*, 891 F.2d 136 (7th Cir. 1989).  "Not surprisingly, human waste has been considered particularly offensive so that 'courts have been especially cautious about condoning conditions that include an inmate's proximity to it.'" *McBride v. Deer*, 240 F.3d 1287, 1291-92 (10th Cir. 2001)(quoting *Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990)).  In *Johnson*, 891 F.2d at 140, for instance, the court found a lack of running water in a segregation cell for three days actionable because the inmate was thus unable to clean cell walls smeared with human feces.  *See also Winston v. Kingston*, Case No. 04-C-59, 2004 U.S. Dist. LEXIS 3930, *8-10 (W.D. Wis. 2004)(finding that where the walls of claimant's cell were "covered with blood and feces," it was not appropriate to dismiss the case prior to discovery).

According to the defendants, when an inmate vacates a cell in segregation at CCI, the cell is not used until the segregation inmate janitor has cleaned the cell.  Once the cell has been cleaned, security staff conducts an inspection prior to an inmate being placed into the new cell.  The only exception to this procedure would be in the event of an emergency on the unit.  Plaintiff claims, however, that notwithstanding this policy, his cell was not cleaned.

It is undisputed that the plaintiff was housed in segregation at CCI from October 13, 2003, to October 23, 2003.  During those ten days, assuming plaintiff's account is true, he was exposed

22

to dried human feces covering the inside of his cell, the smell of human urine and feces, and death threats written on every brick of his cell wall. As a result, again according to plaintiff, he became ill and he could not eat or sleep. Nurse Pearson (who is not a party) had plaintiff taken out of his cell and placed in the day room, where he was given a shot because his head was allegedly as large as a beach ball. However, the plaintiff was then returned to the same cell.

The defendants contend that the conditions of which the plaintiff complains were not serious enough to violate the Eighth Amendment. (Def.'s Br. in Supp. of Mot. for Summary Judgment at 19.) In support of their contention, they cite several cases from this circuit.[5] *Id*. However, in only one of these cases, *Ramirez*, 2004 WL 1920219, *5, was the prisoner exposed to human waste. In that case, Judge Crabb dismissed the plaintiff's claim at the pleading stage because he admitted that he was permitted to clean his cell once a week. *Id*.

The present case is distinguishable because the plaintiff has complained that he was not allowed to clean feces or other human waste in his cell.[6] Thus, the court is not convinced that the plaintiff has failed to establish a sufficiently serious deprivation for purposes of the Eighth Amendment. The plaintiff has alleged that the defendants knew that he was exposed to human waste and denied his requests for cleaning supplies and for transfer to another cell. In particular,

---

[5]Specifically, the defendants rely on *Adams v. Pate*, 445 F.2d 105, 108-09 (7th Cir. 1971); *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988); *Geder v. Godinez*, 875 F. Supp. 1334, 1341 (N.D. Ill. 1995); *Ramirez v. McCaughtry*, 2004 WL 1920219, *5 (W.D. Wis. 2004).

[6]The record suggests reason to question plaintiff's claim. If, as defendant Nickel states in her affidavit, plaintiff filed an Offender Complaint in which he described the graffiti in his cell but made no mention of human feces on the walls, his present account would be seriously in doubt. It would also raise a concern as to whether he had exhausted his administrative remedies as to this claim, since it is the presence of feces, not graffiti, that makes the claim actionable. However, the Offender Complaint to which Nickel refers has not been made a part of the record, *see* Fed. R. Civ. P. 56(e), and exhaustion of remedies, an affirmative defense, has not been asserted.

the plaintiff contends that he personally spoke to Douma, Higbee, Ericksons, Delong, Nickel and Nelson at his cell door concerning the unsanitary conditions of his cell and that they saw firsthand the state of the plaintiff's cell. (Pl.s' Aff. ¶¶ 44, 50, 55, 61.) In contrast, Douma, Higbee, Nickel and Nelson state that they have no personal recollection of the plaintiff or any complaints he made about feces in his cell. (Douma Aff. ¶8; Higbee Aff. ¶¶ 7-8; Nickel Aff. ¶ 10; Nelson Aff. ¶ 9.) Summary judgment is not a procedure for resolving a swearing contest. *See Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992). I therefore conclude summary judgment cannot be granted as to this claim.

**D.     Cold-Weather Clothing**

Plaintiff next claims he was subjected to cruel and unusual punishment in violation of the Eighth Amendment when he was denied a winter coat and hat at WCI from January 20, 2004, to March 23, 2004. The Eighth Amendment proscribes the infliction of cruel and unusual punishment on those convicted of crimes. To prevail on such a claim, plaintiff must establish that he was denied "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). He must also show that the defendants acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 299 (1991). Mechanical rules are not to be employed in determining whether an alleged deprivation violates the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981). However, "only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S. at 347). Prison conditions cannot rise to the level of cruel and unusual punishment unless the conditions produce "the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304.

24

Plaintiff was housed in the North Cell Hall B-21, which is also known as the North Program Segregation unit, from January 20, 2004, to March 23, 2004. North Cell Hall is one of the four main cell halls in the institution. While the majority of inmates in the North Cell Hall are in general population, it also houses inmates who are at the end of their segregation status. Inmates in Program Segregation status are not issued permanent winter coats until they are released from segregation and can go to the store unescorted to receive a coat. (DPFOF ¶¶86-88, 94.)

All North Hall inmates, including those in North Program Segregation, are allowed outdoor recreation. The out-of-cell recreation areas are enclosures with dimensions of approximately 9' x 12'. These enclosures are constructed completely of cyclone fencing material that allows air from the outside into the area. WCI staff recognizes that exercise is a useful tool to increase inmates' body temperature, maintain good circulation, and increase the overall physical and mental fitness of the inmates. However, inmates are not required to exercise outside. Inmates are also encouraged to exercise regularly in their cells and are provided with samples of exercises that can be performed in the cell with no special equipment. (*Id.* ¶¶ 89-93.)

Plaintiff claims that defendant Wallantin, who is WCI's clothing room supervisor, with the knowledge and consent of defendant McCaughtry, refused to provide him with winter clothes while he was in North Program Segregation during the winter of 2004, which precluded him from participating in outdoor recreation. (Third Compl. at 48.) In addition, he submits that defendants Schmidt and Aguirre forced him to go outside without winter clothes when he was given passes to go to the HSC building or the Social Services building. *Id.* at 49. He claims that such denial constitutes cruel and unusual punishment.

25

Defendants dispute plaintiff's version of the facts. They state it is not the policy of WCI to send inmates outside without a coat when it is cold, either for exercise or to go to another building. (*Id.* ¶¶ 90, 94.) They also claim that plaintiff was offered a loner coat to use while in North Program, but he refused, stating that he would not wear someone else's coat. (*Id.* ¶ 94.) Notwithstanding these factual disputes, however, defendants argue summary judgment on plaintiff's claim is appropriate. Even assuming plaintiff's allegations that he was denied a coat are true, they argue, the claim that he was subjected to cruel and unusual punishment because he did not have a winter coat fails.

In support of their argument, defendants first note that plaintiff claims the lack of a coat deprived him of the opportunity to exercise outside during the period from January 20 to March 23, 2004, a period of about two months. Thus, this aspect of his claim is really a claim that he was denied the opportunity for outdoor exercise for approximately two months. But not being allowed outdoor exercise for a period of two months does not constitute cruel and unusual punishment. With respect to exercise, the Seventh Circuit has held that denial of exercise may constitute a constitutional deprivation in "extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli,* 81 F.3d at 1432; *see also French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985). However, the Court has also held that "that short-term denials of exercise may be inevitable in the prison context and are not so detrimental as to constitute a constitutional deprivation." *Delaney v. DeTella*, 256 F.3d 679, 683-84 (7th Cir. 2001); *see also Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir.1997) (holding that 70-day denial of outdoor exercise was permissible). Here, plaintiff makes no claim that his health was threatened by a lack of exercise. Indeed, he does not even claim he was unable to exercise; only that he was unable to

exercise outdoors. This is not enough to establish an Eighth Amendment claim. Accordingly, summary judgment will be granted as to this aspect of his claim.

What remains is plaintiff's claim that his Eighth Amendment rights were violated when he was required to go outside without a coat when he was given passes to go to the HSC building or the Social Services building. As to this aspect of his claim, defendants note that WCI is a compact institution that is constructed such that one does not have to walk far to get from one area or building of the institution to another. Specifically, WCI is approximately 2 city blocks deep by 2 ½ city blocks wide, keeping in mind that these blocks are defined as small city blocks comparable to those in the city of Waupun, Wisconsin. The average distance one would have to walk to get from Point A to Point B at WCI is 250 to 350 feet. The average amount of time it should take to get from Point A to Point B at WCI is 2 to 3 minutes at most. Thus, defendants contend, plaintiff was exposed to the allegedly cold temperatures for 2 to 3 minutes at most and on only two occasions. (DPFOF ¶¶ 99-102.) Exposure to winter temperatures without a coat for so short a time, they contend, does not constitute cruel and unusual punishment.

The court agrees. While subjecting an inmate to winter temperatures without a coat and hat could amount to cruel and unusual punishment, plaintiff has failed to demonstrate the existence of evidence in this case rising to such a level. His complaint and affidavit are silent as to the specific number of times he was given passes requiring that he travel outside without a coat. While he has submitted affidavits from two fellow inmates in which each recounts two such incidents, it is not even clear whether each is recounting the same incidents. In other words, it is unclear whether it happened two times, four, or more. Defendants read plaintiff's complaint as alleging two such incidents, and plaintiff states in his affidavit that it occurred "several" times. (Pl.'s Aff. ¶ 74.) Even

27

considering the cold of Wisconsin winters, several trips outside without a coat lasting no more than three minutes does not amount to cruel and unusual punishment. Summary judgment will therefore be granted on this aspect of plaintiff's claim as well.

THEREFORE, IT IS ORDERED that the defendants' motion for summary judgment (Docket No. 104) is GRANTED in part and DENIED in part. Defendants' motion is denied as to plaintiff's Eighth Amendment claim against defendants Douma, Nickel, Nelson and Higbee concerning the conditions of his cell while confined in segregation at CCI between October 13 through October 23, 2003. Defendants' motion is also denied as to defendant Ericksons, who has not yet been served. As to all other claims of defendants, however, summary judgment in favor of the defendants is granted and plaintiff's claims are dismissed.

IT IS FURTHER ORDERED that, on or before January 20, 2007, the United States Marshal shall exercise reasonable effort to ascertain the address of defendant Ericksons and shall serve him. If the defendant has refused to accept service by mail, personal service must be effected in conformity with Federal Rule of Civil Procedure 4. The address ascertained for purposes of service need not be disclosed to the plaintiff and the certificates of service may be filed under seal with the court. If service is not completed, the Marshal shall submit an affidavit explaining what efforts were made to obtain the addresses of the unserved defendants. This affidavit shall be filed on or before January 20, 2007. The clerk shall set this matter for a telephone status conference after that date.

Dated this ___5th___ day of December, 2006.


       s/ William C. Griesbach
       William C. Griesbach
       United States District Judge

28